William RILEY, Deceased; Vicki Riley and Landon Riley, Respondents,

v.

CITY OF LIBERTY, Missouri and Midwest Public Risk of Missouri, Appellants.

No. WD 75879.

Missouri Court of Appeals, Western District.

July 30, 2013.

**436**

Stacey L. Dungan, Kansas City, MO, for respondents.

Kip A. Kubin, Leawood, KS, for appellants.

Before Special Division: JOSEPH M. ELLIS, Presiding Judge, GARY D. WITT, Judge and ROBERT CLAYTON III, Special Judge.

GARY D. WITT, Judge.

William Riley ("Riley") was employed by the City of Liberty, Missouri ("Liberty"), as a Deputy Fire Chief for the fire department. In the early morning hours of October 6, 2004, Riley suffered a fatal incident of cardiac arrest while at home. His widow, Vicki Riley ("Vicki")[1] filed a timely claim with the Missouri Division of Workers' Compensation seeking death and funeral benefits. The Administrative Law Judge ("ALJ") denied the claim, finding that Riley's death did not arise out of or in the course of his employment. Vicki appealed, and the Labor and Industrial Relations Commission ("Commission") found that Riley indeed suffered an accident arising out of and in the course of his employment with the fire department. The Commission granted an award of weekly death benefits, and the City of Liberty and its insurance carrier, Midwest Public Risk of Missouri ("MPRM"), appeal.[2] For reasons explained more fully below, we affirm.

**Factual and Procedural Background**[3]

William Riley was a deputy fire chief working for the City of Liberty, Missouri, in 2004. Riley had previously been a firefighter for the City of Kansas City, Missouri for twenty-five years before retiring from that department with the title of Division Chief in December, 2002. On August 4, 2003, he was hired by Liberty as the Deputy Fire Chief/Emergency Medical

1. Because Ms. Riley and her husband share the same last name, we refer to her by her first name. No disrespect or familiarity is intended.

2. Taken with the appeal is Vicki's Motion to Strike [Liberty's] Amended Brief for Failure to Comply with Rule 84.04 and to Dismiss the Appeal. That motion is hereby denied.

3. Nothing requires this court to review the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the Commission's decision. The whole record is considered to determine whether there is sufficient competent and substantial evidence to support the Commission's award. *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012) (internal citations and quotation marks omitted).

Services ("EMS") Director for the fire department.

As the Deputy Fire Chief, Riley's duties were primarily administrative and included negotiating with the firefighter's union and handling all personnel issues within the department, such as training, hiring, and supervising employees. He was also working on a large project involving the outsourcing of the EMS billing to a private company. Additionally, he was responsible for implementing a severe weather plan and coordinating it with other city officials based on a federal grant. He attended monthly meetings of the Mid–America Regional Council in conjunction with his responsibility to coordinate emergency preparedness. He was also required to respond to and assist with all fires occurring within Liberty.

As the Director of EMS, Riley was also in charge of Liberty's medical ambulance system, which accounted for eighty percent of the fire department's business. His EMS responsibilities included managing the narcotics and medical supplies stored on the premises, a job that required that he be on-call to restock ambulances since he alone had access to certain supplies. Riley also habitually attended meetings of the Liberty City Council, which met every Monday night. In addition, he was the liaison between the department and a local physician designated as the medical director for the EMS system. Riley's duties essentially kept him on call at all times. He carried a pager and listened to the dispatch radio even while at home.

On the morning of October 5, 2004, Riley was at work and had a heated discussion with Captain Gary Birch ("Birch") regarding an earlier incident involving a police dispatcher named Jo Ann Fuller. Captain Michael Compton ("Compton") testified that after the conversation, Riley appeared angry, was red-faced and that it took Compton forty-five minutes to calm him down. Compton testified that Riley thought Birch had questioned his judgment regarding a situation. Around lunch time, Riley had lunch with his wife, Vicki. Riley then responded to a medical emergency call while either with his wife or with Captain Richie Cunningham ("Cunningham").[4] After arriving on the scene, Riley assisted another fireman in loading a man onto a stretcher and removing him from the building into the ambulance. There is some discrepancy as to whether the man was large or average sized and as to whether he had to be carried up a flight of stairs. Upon their return to the station, witnesses testified that Riley did not appear "well." Riley reportedly said that he thought perhaps he had eaten something that was causing him to feel badly. He told several co-employees that he was "a little tired, but okay." Riley then proceeded to use the station's treadmill. Cunningham, who had worked as a paramedic for more than twenty years, testified that instead of having a reddened face on the treadmill, Riley looked pale, sweaty, and ashen after exercising. Cunningham further testified that looking gray and having indigestion were signs of undergoing a heart attack.

At the close of his shift, Riley called his wife to say he would be home late because he was dealing with personnel issues. He left the station around 5:15 p.m. but did not arrive home until about 7:00 p.m. There is no evidence as to where he went or what he did during that intervening

---

4. Some of the facts found by the Commission are contradictory, which is primarily why Liberty contends that it was erroneous to accept them as true. One of the facts in question is whether Riley took the call while at the conclusion of having lunch with his wife or whether he was with Cunningham when he received the call.

time. When he arrived home, Riley declined to eat his favorite dinner and told his wife that he had been dealing with personnel issues and did not feel like eating or talking about it. He went to bed around 10:00 p.m. He appeared white and his behavior was abnormal in that he usually played with their eight-year-old son, Landon, after arriving home in the evenings.

At about 2:00 a.m., he and his wife were awakened by Landon, who had had a nightmare. Vicki left the bedroom to sleep in her son's room. When Vicki returned at around 4:00 a.m., she found Riley sitting in a chair holding his head saying that his head and throat hurt. Riley requested some hot tea and ibuprofen. Vicki got the two things for him. Riley then took the pain medicine and drank some tea but then seized and went into cardiac arrest.

Vicki immediately called 9–1–1 and then Birch. Birch arrived on the scene while paramedics were still there. Riley was pronounced dead soon thereafter. At the time of his death, Riley was forty-six years old. He did not smoke cigarettes or drink alcohol. He was moderately overweight, but ran for exercise on a treadmill every day. The coroner determined that Riley died of "cardiac arrhythmia related to an acute coronary syndrome."

On June 3, 2005, Vicki filed a timely claim for benefits. On January 14, 2012, following a trial, the ALJ denied Vicki's claim for benefits, finding that Riley did not suffer an accident on October 5, 2004, nor did he die from occupational disease associated with his job. On November 14, 2012, the Commission reversed the decision of the ALJ, finding that the events of

October 5, 2004, "resulted in an increased demand on employee's heart, which culminated in ischemia,[5] which deteriorated to heart failure in the hours leading up to his death early the following morning."

Further facts are set forth below as necessary.

## Standard of Review

Our standard of review is governed by section 287.495. 1,[6] which provides:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

 Liberty challenges the award pursuant to subsections (3) and (4) above. "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003) (citation omitted). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223.

Nothing requires this Court to review the evidence and all reasonable infer-

---

**5.** Ischemia is the condition of inadequate oxygen going to the heart muscle.

**6.** Based on the date of the accident, all statutory references are to RSMo 2004 Cum.Supp. unless otherwise indicated.

ences drawn from the evidence in the light most favorable to the Commission's decision. The whole record is considered to determine if there is sufficient competent and substantial evidence to support the Commission's award. A reviewing court considers whether the Commission could have reasonably made its findings, and reached its result, upon consideration of all the evidence before it.

This Court defers to the Commission's factual findings and recognizes that it is the Commission's function to determine credibility of witnesses. This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding.

*Hornbeck v. Spectra Painting, Inc.,* 370 S.W.3d 624, 629 (Mo. banc 2012) (citations and quotation marks omitted).

■ However, "[w]hen an administrative agency decision is based on the agency's interpretation and application of the law, we review the administrative agency's conclusions of law and its decision *de novo.*" *Mo. Veterans Home v. Brown,* 374 S.W.3d 359, 365 (Mo.App. W.D.2012) (citation omitted).

### Analysis

■ In its sole point relied on, Liberty contends that the Commission erred in its finding that Riley sustained an accident arising out of and in the course of his employment that resulted in his death. Liberty maintains that there was no substantial and competent evidence to support

the Commission's factual findings that Riley suffered an accident while at work and that the facts as found do not support the award. Liberty further contends that the fatal cardiac arrest that Riley suffered while at home was the result of a personal health condition and not related to his position as Deputy Chief of the Liberty Fire Department. We disagree.

The date of the injury as found by the Commission was October 5, 2004, which places it within the purview of the substantive provisions of the Workers' Compensation law in existence prior to the 2005 amendments. "Prior to the 2005 changes in the Workers' Compensation law, an employee's work only had to be a 'substantial factor' and not the 'prevailing factor.'" *Leake v. City of Fulton,* 316 S.W.3d 528, 532 (Mo.App. W.D.2010) (citing § 287.020.3(2)(a)). The courts were also statutorily bound to construe the law liberally in favor of coverage for the employee prior to the 2005 amendments. *Id.*

Significantly, the Commission noted that the ALJ erroneously analyzed the case under the post–2005 law which contains a higher standard for an employee to prove coverage. The Commission noted that Riley did not need to prove that an accident occurring on October 5 was "the prevailing" factor in his injury, only that it was "a substantial" factor. This change in statutory definitions is significant as it changes Riley's burden. Where, as here, both a pre-existing cardiovascular condition and a work-related activity contribute to cause an employee's injury or death, the question becomes whether the activities of October 5 were "a substantial factor" in causing the injury or death.[7] § 287.020.3(1) (RSMo Cum.Supp.2004).

---

**7.** All of the physicians who provided testimony agreed that although Riley was not known to have heart disease and had never been diagnosed as having had a cardiovascular event in his lifetime, the autopsy revealed that he suffered from concentric left ventricular

As noted above, we consider whether the Commission could have reasonably made its findings, and reached its result, upon consideration of all of the evidence. However, "as noted above, this Court defers to the Commission's factual findings and recognizes that it is the Commission's function to determine credibility of witnesses." *Hornbeck*, 370 S.W.3d at 629 (citations and quotation marks omitted). "This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Id.*

 In bringing a challenge based on "weight of the evidence," Liberty must identify (1) a factual proposition needed to sustain the results; (2) identify evidence supporting that position; (3) identify contrary evidence, *subject to the factfinder's credibility determinations, explicit or implicit;* and (4) prove in light of the whole record that the supporting evidence is so non-probative that no reasonable mind could believe the proposition. *Jordan v. USF Holland,* 383 S.W.3d 93, 95 (Mo.App. S.D.2012) (citations omitted) (emphasis added). Here, Liberty identified the factual proposition as whether Riley was involved in a work-related accident on October 5. Liberty then identified the supporting evidence for that position while juxtaposing it against what it perceived to be the contrary evidence. Liberty contends that the evidence the Commission chose to

rely on was incompetent as it contained contradictions.[8]

Liberty points to five factual findings that it argues are not supported by the record: (1) whether an "argument" took place between Riley and Birch; (2) whether Riley received an emergency call while with his wife or with Cunningham; (3) whether Cunningham was present at the scene of the call Riley responded to; (4) whether the argument with the police dispatcher, Jo Ann Fuller, occurred on October 5; and (5) whether Riley appeared to be fine on the afternoon of October 5 or gray in color, perspiring, and ill. Liberty points to these factual "discrepancies" in the evidence in support of its position that the "facts found by the Commission were not supported by substantial and competent evidence to warrant making such award" and "because the evidence relied upon by the Commission was inherently contradictory and contrary to the record as a whole...."

Fatal to this position is our standard of review as applied to these facts. We do not reweigh evidence and select different facts upon which the Commission *should have* relied. We defer to the facts as found by the Commission. In light of that, we (1) look to the facts as found by the Commission to see whether those facts support the award and (2) look to see whether the Commission could have reasonably made its findings upon consideration of all of the evidence.

 First, the Commission found that Birch did have a discussion with Riley about the dispatcher although Birch was

---

hypertrophy, a serious underlying heart condition that made it more likely that he would die from a sudden cardiac event.

**8.** Notably absent from Liberty's point relied on is any reference to the medical evidence offered through each party's medical expert.

To the extent that Liberty raises discrepancies in medical evidence within its argument section, those again are solely issues of witness credibility made by the Commission, to which we defer.

not sure exactly when it took place. Second, the Commission found both Vicki and Cunningham to be credible, which is not inherently contradictory because whether Riley received the emergency call while with his wife or with Cunningham is irrelevant to the ultimate issues; it is undisputed that Riley responded to the call. Liberty is essentially arguing that someone must be lying, yet the Commission found each of these witnesses to be credible. However, just because a witness is found to be credible does not mean that every word that comes from his or her mouth on the witness stand is binding on the factfinder and not subject to dispute. The Commission alone determines which portions of testimony are credible. Third, Liberty points out that Cunningham's name does not appear on the attendance sheet for the emergency call that Riley responded to, so Cunningham could not have been present on the scene to witness the size of the man that Riley helped load or whether he had to be carried up or down stairs. Liberty maintains that this evidence, as facts upon which the Commission relied, is flawed and should not be relied upon to support the award. Cunningham, however, testified that since he was on light duty for a back injury and shadowing the deputy chief, he would not be surprised if his name was not listed on attendance sheet for the call. He then explained that a firefighter's name is usually not listed if he arrives with a chief. Regardless, those, again, are credibility issues for the Commission to determine, and it found Cunningham credible.

Fourth, Liberty argues that there was no evidence that Jo Ann Fuller worked on October 5, 2004. Fuller, however, testified that she recalled a discussion with Riley but was unsure of the date of that discussion. Numerous other witnesses testified that Riley told them on October 5 that he had gotten into an argument with Fuller that day. Moreover, Compton testified

that Fuller told him that if Riley said they had gotten into an argument, then they must have, though she did not recall the specifics. Finally, Cunningham testified that Riley appeared gray and was perspiring on the afternoon of October 5 after using the treadmill. Compton testified that Riley told him he did not feel well, that his blood pressure was up, and that he had a headache. Cunningham testified about how Riley *looked*, while Compton testified about what Riley *said*. These are not in conflict.

After identifying perceived conflicts in the evidence, Liberty argues that the Commission should not believe evidence that is "inherently" contradictory. Liberty further alleges that each critical piece of evidence relied on by the Commission in its findings of fact was negated by a contrary piece of evidence, thus leaving the fact unsupported in the record.

 But contradictions in fact alone do not negate evidence nor make it incompetent. "When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence." *White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010) (citation omitted). It is the Commission's job to sort through and resolve conflicts in the evidence, as would any factfinder. As noted earlier, "[t]his court may not substitute its judgment on the evidence, and *when the evidence before an administrative body would warrant either of two opposed findings*, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Hornbeck*, 370 S.W.3d at 629 (emphasis added).

In sum, the facts as found by the Commission are: that Riley had a heated discussion with Birch over which he considered resigning, that at some point on or

before October 5 he had gotten into an argument with Fuller, that his responsibilities were numerous and caused him stress and to be on call 24/7, that he responded to an emergency call on October 5 that caused him to feel tired, he had a feeling of indigestion, he appeared sickly and gray, and that following the call he reported to others that he did not feel well and had a headache.

In addition to the facts on which Liberty asks us to focus, we review all of the facts adduced at trial to ascertain "whether the award is contrary to the overwhelming weight of the evidence." *Hampton*, 121 S.W.3d at 222–23. Here, Riley's retained medical expert, Dr. Stephen Schuman, opined that Riley's work activities on October 5 were the "prevailing factor" in his cardiac arrest. He further opined that Riley's work tasks such as responding to the emergency call and assisting with loading the patient involved both physical and emotional exertion. The exertion added more stress to Riley's already stressful day, and increased demand on his heart, causing ischemia and cardiac arrest. Additionally, the evidence was that Dr. Schuman's opinion was based on his review of all of Riley's medical records and all depositions taken in this matter.

Liberty's retained medical expert, Dr. Randall Thompson, opined that Riley's work as a Deputy Fire Chief and EMS Director was "not a substantial contributing factor" in his death. Thompson further opined that the types of emotional challenges a firefighter encounters are "extremely common." In his medical report, Dr. Thompson went on to refer to studies of myocardial infarctions (common-ly known as heart attacks) on which he based his opinions. Those studies concluded that heart attacks are only related to a firefighter's work activities if they occur within one hour of extreme exertion; otherwise, they are deemed unrelated.[9]

■ The role of the Commission is to make credibility determinations between contradictory medical opinions, and it chose to rely upon Dr. Schuman's opinions. The factual findings support the Commission's conclusion that Riley suffered an accident in the course of his employment and that his employment was a substantial factor in his cardiac arrest.

Based upon the whole record, there is substantial and competent evidence to support the Commission's award such that we do not have a belief that the judgment of the Commission was wrong.

Based on our standard of review and a review of the whole record before us, Point One is denied.

### Conclusion

We find no error in the Commission's final award. We affirm.

All concur.

---

9. Though credibility of witnesses is not our determination, we note that the Commission referred specifically to Thompson's testimony regarding heart attacks as one reason why it did not find him to be credible. Medical records indicated that Riley died from cardiac arrest caused by ventricular fibrillation, which is not medically consistent with a heart attack or myocardial infarction. Therefore, the Commission found the expert's reliance on these studies to be misplaced.